VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org

Case No.    23-AP-296



*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

FEBRUARY TERM,   2024

| | |
|---|---|
| In re B.A. & R.D., Juveniles<br>(W.D., Father\*) | } APPEALED FROM:<br>}<br>} Superior Court, Addison Unit,<br>} Family Division<br>} CASE NOS. 12-3-20 Anjv & 11-3-20 Anjv<br>Trial Judge: David R. Fenster |

In the above-entitled cause, the Clerk will enter:

Father appeals the termination of his parental rights in daughters B.A. and R.D, born in February 2015 and August 2018, respectively.[*]  We affirm.

The record reflects the following.  In March 2020, the State filed petitions alleging that B.A. and R.D. were children in need of care or supervision (CHINS) and the family division issued emergency- and temporary-care orders transferring custody to the Department for Children and Families (DCF).  At the time, B.A. and R.D. had been in mother's custody pursuant to a final relief-from-abuse order, effective until December 2020, which prohibited father from contacting mother and required that his visitation with the children be supervised.  In May 2020, mother stipulated that the children were CHINS at the time of the petitions because her lack of parenting skills and family support created a risk of neglect and inappropriate physical discipline.

The family division issued an initial disposition order in July 2020 with a goal of reunification with mother.  In August 2020, by agreement of the parties, the disposition order was amended to provide for a goal of reunification with mother and father in six to twelve months.  The court adopted a case plan which recognized father's developmental disability in connection with the contemplated services and called for him to, among other things, "demonstrate his protective capacities by following provider[s'] recommendations for healthy contact with his children."  His action steps included participating in a domestic-violence

---

[*] Mother voluntarily relinquished her parental rights subject to the termination of father's rights and is not party to this appeal.

accountability program, completing an intake appointment with the WomenSafe program to set up supervised visitation with B.A. and R.D., and following WomenSafe's recommendations and protocols during visits.

The State filed petitions to terminate parents' rights to B.A. and R.D. in December 2021. After the completion of father's competence-based parenting assessment, the termination hearing was held over several days, concluding in May 2023. The family division subsequently issued a written order in which it made the following findings of fact under the clear-and-convincing evidence standard.

There had been almost no contact between father and the children for nine months when the amended disposition order was issued in August 2020. Father did not reach out to WomenSafe to arrange for the supervised visits contemplated by the case plan for several more months, telling DCF that he was too busy. When visits ultimately began around January 2021, they did not go well. It was difficult for father to keep up with both children and he missed their emotional cues.

DCF transitioned father's supervised visits to Easter Seals so that father could participate in family time coaching, a referral not initially made because he had not demonstrated the requisite "growth mindset." Easter Seals has considerable experience working with individuals with a variety of developmental presentations. During the program, father demonstrated some strengths: he had excellent attendance; was always on time and prepared with toys, supplies, and snacks; and he never shouted or used profanity with the children or the coach. However, father was resistant to family time coaching. He testified that he has used nothing the coach taught him, does not need anyone to tell him how to parent, and does not need help to support the children.

B.A. and R.D. each have significant emotional and educational needs, and R.D. has significant developmental needs and requires specialized care to assist her in daily life. Both children have experienced trauma arising from family violence, food insecurity, and neglect, and this childhood trauma impacts their needs. During family time coaching, father continually struggled to identify, prioritize, and meet the children's needs.

Father was provided with an informational video about R.D.'s particular speech and language needs but did not watch the video or meet her need to practice language skills. Though father was prompted to encourage R.D. to walk, he continued to carry her despite the impact this was having on the development of her gross motor skills. Father struggled to bond with R.D. and did not recognize her reluctance with him. R.D. frequently "shut down" during visits with father, requiring the coach to step in. Though R.D. ultimately began to return father's demonstrations of affection, her responses were not consistent, and she continued to seek comfort from the family time coach and would "freeze up" in father's presence only to engage with caregivers after he left the visit.

Father's attempts to engage with B.A. sometimes upset her, forcing the coach to intervene. Father would talk about himself but resisted interacting with B.A. on her terms. He did not address her significant emotional needs. On more than one occasion, B.A. told father she was upset that mother had stopped visiting, but father declined to discuss this with B.A., leaving

2

her need for help processing these feelings unmet. Though B.A. began to demonstrate affection toward father, she also started to have unexplained meltdowns. Father comforted B.A. during meltdowns, but would not talk her through her emotions.

Father continued to require reminders from the family time coach to engage in play with B.A. and R.D. and to initiate and maintain conversations with them. He did not consistently respect their wishes when they refused physical contact with him. On one occasion shortly before the concluding day of the hearing, father brought his dog to a visit. The dog barked aggressively, and father struck the dog in the children's presence. The coach had to intervene to parent the children, and father subsequently minimized even the possibility that this event could have negatively impacted the children's feelings of safety.

At times, father struggled with the children during coaching sessions in the community. He needed reminders to be conscious of the people around them and required support to soothe B.A. and R.D. when they became upset at the supermarket.

Father also had lapses in providing for the children's safety. On one occasion, he left them unattended at a table when he went to the counter at a fast-food restaurant. Because R.D. is overly friendly with new people and has no concept of "stranger danger," leaving her unattended presents a heightened risk. Though father improved in this regard, he would still leave the children in a room unattended on occasion. He also twice failed to react to R.D. walking or running into a parking lot. Father does not consistently identify safety concerns.

After almost eighteen months of family time coaching, father had not progressed to unsupervised visits because he still required direct support to care for B.A. and R.D. The coach was still frequently comforting the children during visits, parenting them, and providing a good deal of direct care in father's stead. Father still needed prompting to address safety issues and was not yet able to meet the children's significant needs.

Father presented testimony from Dr. Yuan, who prepared his competence-based parenting assessment based on a clinical interview, observation at two visits, a records review, interviews with collateral contacts, and the administration of several testing instruments. The family division found that Dr. Yuan was not aware of the children's trauma history and did not factor it into her evaluation, did not identify the children's specific emotional and developmental needs, did not review either child's individualized education plan, did not address father's lack of progress over the nearly eleven months that passed between her observation and the hearing, was not aware of observations made during family time coaching, and was not asked about the specific safety concerns identified in other testimony. As a result of these factors, the court explained that it could not place great weight on Dr. Yuan's opinion that father was currently a "good enough" parent. The court found that her testimony established that father had the ability to acquire the skills and knowledge to become an effective parent, but not that he currently possessed the skills and knowledge to parent or had the current capacity to parent B.A. or R.D. specifically.

Based on these findings, the family division concluded that there was a change in circumstances due to father's stagnation. Though father had completed many of the action steps in the case plan, there were others he had not achieved, such as participating in a domestic-

violence accountability program. Over twenty months after the timeline to achieve reunification elapsed, father still struggled to notice and respond to the children's cues and provide safe and attuned care.

The trial court then considered the statutory best-interests factors. B.A. and R.D. were well-adjusted to their homes and schools, had bonded with their respective foster families, and were thriving in their current placements. The court found that father loves the children, but it was unclear how constructive his continuing role in their lives was. Finally, the court concluded that because father did not have a current ability to meet the specific needs of his children and rejected the parent education offered through family time coaching, there was little likelihood that he would make any further progress toward resuming parental duties in a reasonable time. The court concluded that termination of father's parental rights was in the children's best interests. This appeal followed.

When termination of parental rights is sought after initial disposition, the family court conducts its analysis in two steps. In re B.M., 165 Vt. 331, 335 (1996). First, the court must consider whether there has been a change in circumstances, "most often found when a parent's ability to care properly for the child has either stagnated or deteriorated." Id. at 336 (quotation omitted); see also 33 V.S.A. § 5113(b). "If this threshold finding is made, the court must then consider the factors set forth in 33 V.S.A. § 5114 and determine if termination of parental rights is in the child's best interests." In re K.G., 2023 VT 51, ¶ 30, __ Vt. __ (quotation omitted). "The State has the burden of proof at both stages and, as to each point, must meet its burden by clear and convincing evidence." In re R.W., 2011 VT 124, ¶ 15, 191 Vt. 108 (quotation omitted). As long as the court applied the proper standard, we will not disturb its findings unless they are clearly erroneous and will affirm its conclusions if supported by those findings. In re G.S., 153 Vt. 651, 652 (1990) (mem.).

First, father argues that the court's finding that Dr. Yuan was unaware of the children's trauma history and particular needs is clearly erroneous because it is inconsistent with its finding that she reviewed a case plan containing this information. As a result, he contends, the court erred in determining that her testimony did not support the conclusion that father was fit—or could become fit within a reasonable time—to parent B.A. and R.D. See In re D.C., 2012 VT 108, ¶ 22, 193 Vt. 101 ("[T]he critical question in a termination proceeding is whether the parent is fit, or will be fit within a reasonable period of time, to parent the particular child who is the subject of the termination proceeding."). "When findings are attacked on appeal, our role is limited to determining whether they are supported by credible evidence." In re A.F., 160 Vt. 175, 178 (1993).

As indicated above, father argues that the finding that Dr. Yuan was unaware of the children's trauma history is inconsistent with its finding that she reviewed a case plan which detailed their past trauma extensively and described their particular needs. However, the case plan he cites in support of this assertion is dated August 2020, while the case plans Dr. Yuan was found to have reviewed are from February 2021 and February 2022. See V.R.A.P. 28(a)(4) (providing that appellant's argument must contain "citations to the . . . parts of the record on which the appellant relies"). Even assuming that the case plans Dr. Yuan reviewed contained information about trauma the children experienced, this does not contravene a finding that she nonetheless lacked awareness of their trauma history where her own testimony supported that

4

conclusion. While Dr. Yuan knew of some of the children's prior adverse experiences and acknowledged that they had experienced trauma, she was not aware that they had experienced neglect of their basic needs. Father does not challenge the court's conclusions that the children's trauma history included neglect. Dr. Yuan herself agreed that additional information about the extent and type of trauma the children experienced would have been helpful to her assessment of father's ability to parent them. The finding that Dr. Yuan was not aware of the children's trauma history is not clearly erroneous in light of her own acknowledgment that she was not aware of the full scope of the trauma they were found to have experienced. See In re A.F., 160 Vt. at 178.

To the extent father suggests that the trial court otherwise erred in determining that Dr. Yuan was unaware of the children's particular needs, he has identified no such finding. See V.R.A.P. 28(a)(4). Instead, the court found that Dr. Yuan's testimony did not specifically address the children's needs and that she did not identify R.D.'s language-development needs. Again, even assuming that the case plans Dr. Yuan reviewed included information about the children's needs, this does not preclude a finding that her testimony did not specifically address those needs or that she did not identify R.D.'s language-development needs. Father has not identified any basis to conclude that the court's findings on this point were clearly erroneous.

Next, we consider father's argument that the family division erred in making a threshold finding of stagnation. He points to evidence of his compliance with the case plan and requests for more visitation time and contends that, to the extent the court faulted him for failing to progress to unsupervised visitation, this was the result of DCF's failure to allow such visitation. Father suggests that he could have transitioned to unsupervised visits or resumed parenting with a safety plan in place because Dr. Yuan opined that he could provide care for the children that would not cause harm and could safely parent them with supports.

To begin, we note that a parent's compliance with the case plan is "not determinative of whether stagnation may be found." In re D.M., 2004 VT 41, ¶ 7, 176 Vt. 639 (mem.) (explaining that a "case plan is not intended to be a mere checklist the parent must satisfy to ensure the automatic return of the children to the parent's care"). And in any event, while the trial court credited father with completing many of his action steps, it also recognized that others remained outstanding. Significantly, though the timeline to achieve reunification had elapsed over twenty months prior, father continued to struggle to notice and respond to the children's cues and to provide safe and attuned care. Under these circumstances, father's completion of many of his action steps did not preclude a finding of stagnation.

Nor was father's failure to progress to unsupervised visits a factor outside of his control. See In re S.R., 157 Vt. 417, 421-22 (1991) (recognizing that stagnation caused by factors beyond a parent's control cannot support termination of parental rights). The family division expressly found that father was not able to have unsupervised visits because he continued to require direct support to care for the children. To the extent father suggests that this conclusion was inconsistent with Dr. Yuan's opinion, it was for the trial court, not this Court, to determine the weight to assign to that opinion. In re A.F., 160 Vt. at 178 ("We leave it to the sound discretion of the family court to determine the credibility of the witnesses and to weigh the evidence."). Father does not explain how a safety plan could have facilitated unsupervised contact in light of his continued need for direct support to care for the children. The resistance to family time coaching which prevented father from overcoming that need and progressing to unsupervised

5

visits was a factor solely within his own control. See, e.g., In re D.M., 2004 VT 41, ¶ 6 (rejecting argument that stagnation was caused by factors beyond mother's control and observing that "[c]hanging her own behavior and implementing the many parenting lessons she received from . . . service providers was and remains fully within mother's control"). The family division did not abuse its discretion in finding that father had stagnated in his ability to care for B.A. and R.D.

Finally, we consider father's argument that the family division terminated his parental rights based on "minor concerns," contravening the statutory requirement to construe the best-interests factors "to preserve the family and to separate a child from his or her parents only when necessary to protect the child from serious harm or in the interests of public safety." 33 V.S.A. § 5101(a)(3). In support of this argument, father contrasts Dr. Yuan's testimony with that of the family time coach and argues that the coach was not qualified to assess father's parenting abilities. He suggests that the court should have credited Dr. Yuan's observations of father's parenting and discredited the coach's concerns.

While the law contains the statutory purpose identified by father, it also requires that the Juvenile Proceedings Act be construed "to ensure that safety and timely permanency for children are the paramount concerns in the administration and conduct of proceedings" thereunder. Id. § 5101(a)(4) (emphasis added). Safety and timely permanency for the children were the underpinnings of the family division's conclusion that the most important factor—whether father could resume parental duties within a reasonable time—weighed in favor of termination. See In re D.S., 2014 VT 38, ¶ 22, 196 Vt. 325; 33 V.S.A. § 5114(a)(3). The court noted that B.A. and R.D. were very young when they entered DCF custody and, over three years later, father still lacked the ability to recognize and meet their significant needs and was unlikely to make further progress in a reasonable period because of his resistance to parent education. See In re C.P., 2012 VT 100, ¶ 30, 193 Vt. 29 ("The reasonableness of the time period is measured from the perspective of the child's needs, and may take account of the child's young age or special needs." (citations omitted)). We cannot agree with father's description of concerns about his ability to identify and respond to safety issues or meet the children's significant needs as "minor." Instead, those concerns went to the heart of his ability to resume parental duties. Father has not identified any basis to conclude that the court's weighing of the best-interests factors was inconsistent with the statutory purposes set forth at § 5101(a).

In analyzing father's ability to resume parental duties in a reasonable time, the family division recognized the discrepancies between Dr. Yuan's observations of father's parenting and what others observed of his parenting. The court concluded that—regardless of the reason for these differing accounts—the weight it could afford Dr. Yuan's opinion was impacted by her failure to address the other observations which called the conclusions of her assessment into question. It is not our role to reweigh this evidence on appeal. In re S.B., 174 Vt. 427, 429 (2002) (mem.) ("Our role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating . . . parental rights"). And while father briefly suggests that he would have had an immediate ability to parent the children if DCF implemented Dr. Yuan's recommendations, he does not explain what those recommendations were or challenge the court's finding that Dr. Yuan evaluated DCF's implementation of the recommendations in her assessment and did not identify any available services that DCF failed to provide. Finally, father cites In re N.H. for the proposition that

termination is inappropriate if questions remain about a parent's ability to assume an active parental role. 135 Vt. 230, 237 (1977). Father's reliance on this case is misplaced as In re N.H. did not involve the termination of parental rights but, instead, a challenge to a disposition order. Id. The family division did not abuse its discretion in concluding that the termination of father's parental rights was in the children's best interests.

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Karen R. Carroll, Associate Justice

_____
William D. Cohen, Associate Justice